UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

DONALD J. CLOVER,                    )
                                     )
                Plaintiff,           )
                                     )
        v.                           )        No. 4:07 CV 574 DJS
                                     )                          DDN
MICHAEL J. ASTRUE,                   )
Commissioner of                      )
Social Security,                     )
                                     )
                Defendant.           )

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This action is before the court for judicial review of the final
decision of defendant Commissioner of Social Security denying the
application of plaintiff Donald J. Clover for disability insurance
benefits and supplemental security income under Title II and Title XVI
of the Social Security Act (the Act), 42 U.S.C. §§ 401, <u>et seq.</u>, and
1381, <u>et seq</u>.  The action was referred to the undersigned United States
Magistrate Judge for review and a recommended disposition under 28 U.S.C.
§ 636(b).  For the reasons set forth below, the undersigned recommends
that the ALJ's decision be reversed and remanded.


**I.  BACKGROUND**

Plaintiff Donald J. Clover was born on August 12, 1957.  (Tr. 21.)
He is 5'8" tall, with a weight that has ranged from 140 to 155 pounds.
(Tr. 311.)  He is married and has two children.  (<u>Id.</u>)  He completed
twelve years of school and last worked as a carpenter.  (Tr. 44-45, 64.)

On February 26, 2002, Clover applied for disability insurance
benefits and supplemental security income, alleging he became unable to
work on October 26, 1999, because of a fractured right wrist, back pain,
problems in his right arm, and pain and numbness generally.  (Tr. 21,
24.)  The application was denied.

On April 18, 2005, Clover applied again for disability insurance
benefits and supplemental security income.  He alleged that he became
unable to work on May 31, 2000, because of a fractured right wrist, back

pain, problems in his right arm, and pain and numbness generally. (Tr. 97-99.) The application was denied on July 19, 2005. (Tr. 86-90.) A hearing was held on July 11, 2006. (Tr. 72-75.) On July 11, 2006, Clover amended the onset date of his disability, changing it from May 31, 2000, to March 28, 2005. (Tr. 69.) On September 11, 2006, the ALJ denied benefits. (Tr. 7-16.) On February 10, 2007, the Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 2-4.)

## II. MEDICAL HISTORY

On October 26, 1999, Clover fell down steps and injured his wrist, though there was no evidence of a fracture and his carpal bones were normally aligned. There was some mild soft tissue swelling at his wrist. (Tr. 293-97.)

On November 8, 1999, Dr. Larry Marti, M.D., placed Clover in a short-arm, fiberglass cast. A tomogram revealed a distal radius fracture and an ulnar styloid fracture.[1] (Tr. 198-99, 267.)

On December 6, 1999, Dr. Marti removed the cast from Clover's wrist. Dr. Marti was going to start Clover on physical and occupational therapy for his right arm. He injected Clover's shoulder with a Xylocaine mixture which relieved his symptoms.[2] Clover noted that his goal was to increase his range of motion. (Tr. 197, 264.)

On December 7, 1999, Clover reported his pain was 4-5 out of 10, and that his hand was feeling better and he could move it a little more. (Tr. 263.)

On December 22, 1999, Dr. Marti examined Clover's wrist, and expressed concern that Clover was not gaining the desired function in his wrist. Dr. Marti wanted him to try and regain his range of motion and

---

[1]The radius is the lateral and shorter of the two bones of the forearm. Stedman's Medical Dictionary, 1310 (25th ed., Williams & Wilkins 1990). The ulna is the medial and larger of the two bones of the forearm. Id., 1663.

[2]Xylocaine is a local anesthetic that works by causing temporary numbness in the skin and mucous membranes. http://www.webmd.com/drugs. (Last visited July 3, 2008).

strength.  Clover noted that his right shoulder pain had decreased, and was down to 1-2 out of 10 "most of the time."  Clover received a prescription for Vioxx.[3]  (Tr. 194, 256.)

On January 26, 2000, x-rays of Clover's wrist revealed a fracture of the right wrist with a dorsal subluxation of the lunate, but not a true dislocation.[4]  The fracture was located in the distal radius area.  An x-ray of the neck showed continued degenerative disk disease at C6-7, with some narrowing at the neuroforamina.[5]  Dr. Marti recommended an MRI of the right shoulder and of the cervical spine, because Dr. Marti believed Clover's arm pain was coming from his neck and not his shoulder.  (Tr. 192-93.)

On February 8, 2000, an MRI of the cervical spine revealed a left paracentral disk protrusion at C4-5, and a posterior spur formation at C5-6 and C6-7.[6]  An MRI of the right shoulder showed no evidence of a

_____

[3]Vioxx was used to treat arthritis pain, but is no longer on the market.  http://www.webmd.com/drugs. (Last visited July 3, 2008).

[4]A subluxation is an incomplete dislocation.  The normal relationship is altered, but there is still some contact between joint surfaces.  Stedman's Medical Dictionary, 1494.  The lunate bone is one of the bones in the hand.  Id., 1104

[5]The human spinal column consists of thirty-three vertebrae.  There are seven cervical vertebrae (denoted C1-C7), twelve thoracic vertebrae (denoted T1-T12), five lumbar vertebrae (denoted L1-L5), five sacral vertebrae (denoted S1-S5 and fused together into one bone, the sacrum), and four coccygeal vertebrae (fused together into one bone, the coccyx).  The cervical vertebrae form part of the neck, while the lumbar vertebrae form part of the lower back.  The sacrum is immediately below the lumbar vertebrae.  Stedman's Medical Dictionary, 226, 831, 1376, 1549, 1710, Plate 2.
    The neural foramen is the space through which nerve roots exit the spinal canal to form peripheral nerves.  Each foramen is a bony canal formed by the pedicles of two adjacent vertebrae.  http://www.medcyclopaedia.com/?tt_topic=.

[6]A spur, or calcar, is a small projection from a bone.  Stedman's Medical Dictionary, 227.

rotator cuff tear, no significant joint effusion, and no abnormal bone marrow signal.[7]  (Tr. 240.)

On February 10, 2000, Dr. Matthew Rieth, M.D., performed a nerve conduction study and an electromyogram (EMG) on the right upper extremity.[8]  The tests revealed no evidence of right carpal tunnel syndrome or right ulnar neuropathy.[9]  There was also no evidence for right cervical radiculopathy.[10]  Dr. Rieth suggested shoulder pathology at the rotator cuff was the possible source of the patient's symptoms.  (Tr. 237.)

On February 18, 2000, Dr. Marti reviewed an MRI of Clover's shoulder and neck.  The shoulder was basically normal, but the MRI revealed abnormalities at C4, C5, C6, and C7.  Dr. Marti suggested a CAT scan of the cervical spine to look for definite abnormalities.  (Tr. 191.)

On February 22, 2000, a CT of the cervical spine revealed minimal lateral disk bulging at C4-5 on the left, but severe narrowing of the neural foramen bilaterally at C6-7, with almost complete obliteration of that foramina.  Dr. Marti believed this narrowing explained the weakness in Clover's triceps, and requested that a neurosurgeon evaluate the possibility of surgical decompression.  (Tr. 190, 291.)

On April 19, 2000, Dr. Marti saw Clover for problems associated with his right wrist.  Dr. Marti diagnosed him with a fracture and subluxation, producing stiff wrist syndrome and continued pain in the right wrist.  (Tr. 189.)

On April 26, 2000, Dr. John Merkle, M.D., conducted a lateral linear tomography of Clover's right wrist.  The tomography revealed dorsal

_____

[7]Effusion is the escape of fluid from the blood vessels into the tissues or into a cavity.  Stedman's Medical Dictionary, 491.

[8]Electromyography is a method of recording the electric currents generated in an active muscle.  Stedman's Medical Dictionary, 497.

[9]Neuropathy is any disorder affecting any segment of the nervous system.  Stedman's Medical Dictionary, 1048.  The ulnar nerve is in the elbow.  Id., 1663.

[10]Cervical means relating to the neck.  Stedman's Medical Dictionary, 280.  Radiculopathy is a disease of the spinal nerve roots.  Id., 1308.

carpal dislocation at the radiocarpal joint, with pseudoarthrosis between the right distal radius and the lunate.[11] Dr. Merkle also noted a degenerative bony eburnation and subchondral cyst formation involving the ulnar styloid of the right distal radius.[12] There was a minimally displaced fracture of the right ulnar styloid, and a small (less than 5 mm) dorsal chip fragment off the dorsal aspect of the right distal radius. (Tr. 233.)

On June 6, 2000, Dr. Marti performed surgery on Clover's wrist to repair rotary subluxation of the navicular lunate, and dorsal subluxation of the lunate with a fracture of the distal radius. Conservative treatment had proved ineffective at improving his pain and functional impairment. After the surgery, Clover was taken to the recovery room in good condition. Dr. Marti characterized Clover's injury as very complex. (Tr. 183-87.)

On June 19, 2000, Dr. Marti saw Clover for post-operative treatment for his rotary subluxation of the navicular. Clover reported no pain and his x-rays showed excellent position and derotation of the navicular lunate. Dr. Marti removed his stitches and placed his wrist in a short fiberglass cast. Dr. Marti was pleased the pain was gone, but concerned that Clover could develop degenerative arthritis in his wrist. (Tr. 182.)

On July 17, 2000, Dr. Marti removed Clover from his cast. X-rays showed the navicular lunate dislocation was reduced, but that there was still some dorsal posturing and arthritic changes in his wrist. There was also some disuse osteoporosis.[13] At the same time, Dr. Marti believed

---

[11]Pseudoarthrosis, or pseudarthrosis, is a new, false joint arising at the site of an ununited fracture. Stedman's Medical Dictionary, 1277.

[12]Eburnation is a change in exposed subchondral bone in degenerative joint disease, in which the bone is converted into a dense substance with a smooth surface like ivory. Stedman's Medical Dictionary, 484. Subchondral refers to anything situated beneath cartilage. Id., 1492. A cyst is an abnormal sac containing gas, fluid, or a semisolid material with a membranous lining. Id., 387.

[13]Osteoporosis is the reduction in the quantity of bone or atrophy of skeletal tissue. Stedman's Medical Dictionary, 1110.

Clover had done extremely well.  He did not have any pain or discomfort.
Clover was instructed to work on gaining strength back in his wrist.
(Tr. 180.)

On August 14, 2000, Dr. Marti saw Clover for a follow-up concerning
his wrist injury.  Clover was gaining strength and motion in his wrist
and did not have any pain.  He was showing improvement, but still did not
have a lot of strength in his arm.  Dr. Marti diagnosed him with a
subluxation of the navicular lunate and a slight dorsal displacement and
intra-articular fracture of the distal radius.  (Tr. 178.)

On March 14, 2001, Dr. Marti found Clover had degenerative arthritis
in his right wrist, but maintained fairly good motion.  Dr. Marti
believed Clover had about 50% function in his wrist.  (Tr. 176.)

On March 30, 2001, Clover saw Dr. Marti for a follow-up.  Dr. Marti
believed Clover's neck and shoulder problems related to his neck.  Dr.
Marti believed Clover was no longer "qualified to continue working as a
carpenter and at this time should apply for his social security."  (Tr.
175.)

On October 22, 2001, Clover saw Dr. Marti for an evaluation of his
back problems.  An x-ray of the lumbar spine showed the disk spaces were
well maintained, but that there was a partial interarticular defect at
the L5-S1 area.[14]  Dr. Marti diagnosed Clover with spondylolysis at L5-S1,
with irritation to the sciatic nerve, and chronic lower back pain.[15]  (Tr.
173-74.)

On October 29, 2001, an MRI of the lumbar spine revealed a diffuse
disk bulge and right-sided protrusion at L5-S1, which extended largely
into the epidural fat, crowding at the right neural foramen, and a small
paracentral focal protrusion at T12-L1, of uncertain clinical relevance.
(Tr. 222.)

---

[14]Interarticular means between two joints.  Stedman's Medical
Dictionary, 790.

[15]Spondylolysis is degeneration of the articulating, or joining, part
of a vertebra.  Stedman's Medical Dictionary, 1456.  The sciatic nerve
is a large nerve that runs from the buttocks down the leg.  Id., Plate
24.

On November 7, 2001, Clover saw Dr. Marti for a follow up of his back pain. An MRI showed a diffuse disk bulge and right side protrusion at L5-S1, with foraminal narrowing at L5. Given his neck and shoulder problems, Dr. Marti told Clover he would be unable to perform construction work and advised him that surgery could be worth considering. Clover said he preferred a conservative approach and Dr. Marti believed that approach would be appropriate if there was not any peripheral neuropathy. (Tr. 172.)

On December 21, 2001, Clover saw Dr. Marti for a follow-up. Dr. Marti noted significant pain and functional impairment at C6-7 of the cervical disk, and at L5-S1 of the lumbar disk. There was atrophy around the shoulder muscle and traumatic arthritis in the wrist, where he had his fracture. During this visit, Dr. Marti filled out the paperwork for Clover's Social Security hearing. In his opinion, Clover was "not capable of returning to his kind of work and is not a candidate for vocational rehabilitation." Dr. Marti added that Clover "should be considered functionally disabled . . . because of the multitude of problems that he has involving his dominant upper extremity, his lower back and his neck." (Tr. 171.)

On February 26, 2002, Sheila Sanders completed a disability report. During a face-to-face interview with Clover, Sanders did not observe Clover have any difficulties sitting, standing, walking, writing, or using his hands. (Tr. 53-56.)

On February 26, 2002, Clover completed a disability report. He noted that his fractured right wrist, back pain, and pain and numbness in his right arm limited his ability to work. In particular, his impairments made him unable to lift very much with his right arm or right hand, and unable to stand or sit for extended periods. Clover stopped working on October 26, 1999, the date he fractured his wrist. After the injury, Clover stated he was unable to perform his duties as a carpenter. In November 1999, Clover began seeing Dr. Marti for his pain and wrist fractures. He received pain medication and had an operation on his wrist. (Tr. 57-66.)

On March 19, 2002, Clover completed a pain questionnaire. He described a sharp and aching pain in his wrist, a sharp and shooting pain

in his shoulder and right arm, and an aching pain in his back.  Clover
also noted pain in his right knee.  The pain has limited his activities
for the past two years and is present whenever he is awake.  The pain
limited Clover from performing a range of physical movements.  To help
relieve the pain, Clover would reposition himself.  He also noted taking
Darvocet and Tylenol.[16]  (Tr. 39.)

On March 19, 2002, Clover completed a claimant questionnaire.  His
wife, Karen, helped Clover fill out the form, since his wrist made
writing painful.  On the form, Clover noted pain in his lower back, right
shoulder, and right wrist, numbness in his right index finger, muscle
weakness in his right arm, and that his right knee sometimes gave way.
Sitting or standing too long exacerbated his back pain.  He was also
unable to hold or lift anything with his right hand because of the wrist
and arm pain.  (Tr. 40-43.)

On March 19, 2002, Clover completed a work history report.  From
1980 to 1999, he worked as a carpenter.  As part of the job, he walked,
stood, and handled small objects eight hours each day.  He lifted up to
a hundred pounds and frequently lifted twenty-five pounds.  (Tr. 45-52.)

On April 25, 2002, John Demorlis, M.D., wrote to Sheila Kemna, a
disability determinations counselor, explaining his evaluation of Clover.
Clover reported lower back pain that radiated down the right leg to about
the level of the knee, and pain in the back of his neck that radiated
down the right trapezius into the right arm and in between his shoulder
blades.  Clover also complained of pain in his right wrist (about 8 out
of 10), and a pain in his right knee that gradually grew worse (about 3
out of 10).  Clover said he could walk for seventy yards, stand for five
minutes, sit for fifteen minutes, and lift about forty pounds on account
of his back pain.  (Tr. 284-85.)

In his examination, Dr. Demorlis found Clover's back exhibited
normal curvature, and there was no complaint on percussing his vertebral

_____

[16]Darvocet is a drug with a narcotic component and is used to treat
mild to moderate pain.  http://www.webmd.com/drugs. (Last visited July
3, 2008).

column.[17]  Clover's wrist exhibited some pathology, but there was no swelling and was negative for Tinel's sign.[18]  His grip was +5/+5.  In his impression, Clover had chronic lower back pain without evidence of radiculopathy, bulging disk at L5-S1, chronic neck pain secondary to degenerative disk disease at C6 and C7, and right neural foraminal encroachment.  Clover also had status post-fracture right wrist, with right wrist pain, and decreased range of motion in the wrist.  Finally, Clover had chronic right knee pain and a history of tobacco use.  Dr. Demorlis found Clover had normal range of motion in his back and shoulders, and exhibited 5/5 grip strength.  (Tr. 286-90.)

On May 14, 2002, Sheila Kemna completed a physical residual functional capacity assessment for Clover.  The primary diagnosis was lower back pain and a bulging disk at L5-S1, degenerative disk disease at C6-7, right knee pain and right wrist pain.  Kemna found Clover could occasionally lift fifty pounds, frequently lift twenty-five pounds, stand and / or walk for about six hours in an eight-hour workday, sit for about six hours in an eight-hour workday, and perform unlimited pushing and pulling.  In reaching these conclusions, Kemna relied on various medical reports.  (Tr. 27-29.)

Kemna found Clover could frequently climb stairs, stoop, kneel, and crouch, and occasionally crawl and climb ladders or scaffolds.  Clover suffered from chronic lower back pain and degenerative disk disease of the cervical spine, and excessive climbing and crawling could exacerbate these impairments or lead to injury.  Clover had no manipulative, visual, or communicative limitations.  He was to avoid concentrated exposure to extreme cold, vibrations, and hazards, which could aggravate his impairments or lead to injury.  (Tr. 30-32.)

Based on these findings, Kemna classified Clover's residual functional capacity as being at the medium level.  She added, however,

---

[17]Percussion is a diagnostic procedure designed to determine the density of a part by tapping the surface with a finger.  Stedman's Medical Dictionary, 1162.

[18]Tinel's sign is a sensation of tingling, or of "pins and needles," felt in the distal extremity of a limb, when percussion is made over the site of an injured nerve.  Stedman's Medical Dictionary, 1422.

that Clover's "complaints of pain and restrictions in functioning seem to be out of proportion to the medical and laboratory findings. Claimant is deemed partially credible." Kemna also noted that her conclusions about Clover's limitations were significantly different than the conclusions of Dr. Marti. (Tr. 33-35.)

On March 28, 2005, an MRI revealed a left central disk protrusion at C4-5, which impinged on the thecal sac and left C4-5 neural foramen, a right central disk protrusion at C5-6 with encroachment upon the right C5-6 neural foramen, and broad-based disk protrusion at C6-7. (Tr. 70, 221.) This is the date of Clover's amended onset date. (Tr. 69.)

On April 10, 2005, an MRI revealed supraspinatus tendinosis without a complete rotator cuff tear, and degenerative changes of the acromioclavicular joint.[19] (Tr. 219-20.)

On April 13, 2005, Dr. Marti wrote to Dr. Robert Heim, Jr., M.D. Dr. Marti detailed Clover's medical history, and noted his current problems with his shoulder. Clover could not fully abduct his shoulder, had significant atrophy of the triceps muscle, and described pain in his hand. MRIs of the right shoulder did not show any significant rotator cuff tear, only tendonitis. An MRI of the spine showed a large central disk at C4-5 and C5-6, with a broad base disk protrusion at C6-7. Dr. Marti noted Clover continued to experience pain in his neck and shoulder, that he was not able to resolve the symptoms, and that it was his belief that Clover would "need surgical intervention." (Tr. 167-68.)

On April 26, 2005, Dr. Heim saw Clover for an examination. Dr. Heim noted that Clover was in no acute distress, his gait was steady, and his head and shoulders were held in a normal position. There was no tenderness in the neck. Clover displayed a full range of motion of flexion, extension, and lateral bending. There was no restriction of movement about the shoulder, elbow, or wrist. There was also no restriction of movement at the hip, knee, or ankle. Examining his

---

[19]The supraspinatus is a small muscle in the upper limb, and one of the muscles that forms the rotator cuff. Stedman's Medical Dictionary, Plate 8. Tendinosis, a form of tendonitis, is inflammation of a tendon. Id., 1561. The acromioclavicular joint is a joint in the top of the shoulder, between the clavicle and the scapula. Id., 19, Plate 1.

musculature, Dr. Heim saw there was diffuse muscle wasting in the right shoulder with weakness in the region. There was 2/5 strength in the right deltoid and 3/5 in the right infraspinatus and supraspinatus. Dr. Heim also noted spondylosis from C4 to C7, a herniated disk at C4-5, and foraminal narrowing at C6 and C7. In his impression, Clover suffered from chronic weakness in the right shoulder and sensory disturbances like upper brachial plexopathy.[20] (Tr. 273-75.)

On April 29, 2005, Dr. Rieth conducted an EMG of the right upper extremity. The EMG did not identify any lateralizing weakness in the right upper extremity, but did indicate some deformity at the right wrist, consistent with prior fractures. There was no muscle spasm in the back muscles, but Clover was unable to demonstrate full motion in the shoulder. However, Dr. Reith was "not sure he is giving a full effort. Passively, I can achieve essentially normal motion with not a lot of resistance." Dr. Rieth concluded that Clover had mild right carpal tunnel syndrome, some old changes in the pronator teres muscle, consistent with denervation and renervation, and reduced motion at the right shoulder, the cause of which was unclear.[21] Dr. Rieth recommended occupational therapy, because he did "not see evidence that the patient should not have normal shoulder motion." Dr. Rieth did believe that, given Clover's previous wrist fractures, he might ultimately require definitive carpal tunnel release. (Tr. 217-18, 270-71.)

On May 6, 2005, Clover saw Dr. Marti, complaining of right shoulder pain. Dr. Marti injected Clover with a Xylocaine mixture, and reported a good relief of the symptoms, with "complete resolution of his pain." Dr. Marti prescribed Naprosyn and Percocet and sent Clover to physical

---

[20]Brachial plexopathy is decreased movement or sensation in the arm and shoulder due to a nerve problem. National Institutes of Health, Medline Plus, http://www.nlm.nih.gov/MEDLINEPLUS/ency/article/001418.htm. (Last visited July 3, 2008).

[21]The pronator teres muscle is located in the forearm. Stedman's Medical Dictionary, Plate 10.

and occupational therapy for his neck, shoulders and upper back.[22] (Tr. 166.)

On May 10, 2005, Clover began occupational therapy. Kathy Harrison, an occupational therapist, noted Clover was suffering from myofascitis and muscle weakness in the right shoulder and neck.[23] Clover said that his symptoms had begun in March of 2005, after he helped put up metal sheeting on a building. Clover had symptoms of numbness and tingling in the right wrist. An EMG revealed carpal tunnel syndrome in the wrist. Clover noted a shooting pain from the shoulder to the elbow with some episodes progressing to the finger tips. Clover rated his pain at 3-4 out of 10 most of the time, but that it increased to 6-7 out of 10 when performing daily living activities with his affected right arm. Harrison noted that his shoulder problems limited his ability to groom, dress himself, and fish. (Tr. 215-16.)

On May 13, 2005, Clover reported to occupational therapy. He noted a little soreness in the top of the shoulder. He also thought that he might "have overdone it yesterday. I installed a ceiling fan and mowed the grass." Harrison noted Clover tolerated all of his treatment and that he said the exercises felt good. (Tr. 213.)

On May 24, 2005, Harrison observed that Clover's middle trapezius muscle was moderately atrophied. At the same time, Clover said his shoulder felt better, and that "I don't have a lot of pain during the day, except with some activities." (Tr. 209.)

On June 3, 2005, Harrison completed an occupational therapy assessment for Clover. Clover had gone to occupational therapy for right shoulder myofascitis and weakness from May 10, 2005, to June 3, 2005, with a total of eleven or twelve scheduled visits. The focus of the treatment was to decrease the pain associated with activity, and improve

---

[22]Naprosyn is used to relieve mild to moderate pain from various conditions. It can reduce the pain, swelling, and joint stiffness caused by arthritis. Percocet is an opiate-type medication, used to relieve moderate to severe pain. http://www.webmd.com/drugs. (Last visited July 3, 2008).

[23]Myofascitis, or myositis fibrosa, is the hardening of a muscle through an interstitial growth of fibrous tissue. Stedman's Medical Dictionary, 1018.

functional mobility and strength.  Harrison found Clover "compliant and cooperative throughout treatment and with home program."  Clover reported that he no longer had constant pain in the shoulder, and no longer experienced the shooting pain down the arm to the fingers.  Episodes of numbness and tingling in the fingers had also resolved.  Harrison noted that Clover still had difficulty reaching overhead.  Harrison concluded that Clover had made "good gains in all areas of treatment."  At the same time, he continued to lack strength in the middle trapezius and posterior deltoid, and continued to substitute with shoulder blade elevation to reach with his right arm.  Clover had right grip strength of seventy-five pounds and left grip strength of ninety-eight pounds.  Harrison recommended that Clover be discharged to a home program.  (Tr. 203-04.)

On June 24, 2005, Clover completed another work history report. From November 1980 until June 2002, Clover worked as a carpenter.  As part of the job, he walked, stood, climbed, stooped, knelt, crouched, crawled, and handled objects eight hours each day.  He lifted up to a hundred pounds, and frequently lifted twenty-five pounds.  In September 2002, Clover worked at the St. James Golf Club.  As part of the job, he walked, stood, stooped, and crouched for five hours each day.  (Tr. 139-146.)  Clover told an employee of the Social Security Administration that he quit his job at the golf club because of his disabilities.  (Tr. 132-38.)

On June 25, 2005, Clover completed a function report.  He was able to make coffee, care for his dogs, do the dishes, do laundry, prepare meals, and sometimes mow the lawn.  He had to take frequent stops, because of the pain, when he did the laundry, the dishes, or mowed the lawn.  He had trouble sleeping, but did not have any problems with personal care or grooming.  He could not hammer or lift things above his head.  He could shop, drive by himself, and pay the bills.  Clover's impairments affected his ability to lift, squat, bend, stand, reach, sit, kneel, climb stairs, complete tasks, concentrate, and use his hands. Clover did not take care of anyone in his family.  (Tr. 124-131.)

On July 18, 2005, Ellvan Markley, a disability determination services counselor, completed a physical residual functional capacity assessment for Clover.  She noted his primary diagnosis was cervical disk

disease, but that he also suffered from lumbar disk disease and degenerative joint disease of the right shoulder. In her assessment, Markley found Clover could occasionally lift twenty pounds, frequently lift ten pounds, could stand and /or walk for six hours in an eight-hour workday, could sit for six hours in an eight-hour workday, but could perform only limited pushing and pulling in the upper extremities. Markley relied on Clover's past medical visits to reach these conclusions. (Tr. 116–18.)

Markley believed Clover could occasionally climb stairs, stoop, kneel, and crouch, but could never climb ladders or crawl. She found he had no visual or communicative limitations, but was "moderately to markedly limited in frequent overhead reaching with the right upper extremity." Clover was to avoid concentrated exposure to extreme cold and avoid even moderate exposure to vibration and hazards (such as machinery and heights). Clover reported doing the dishes, mowing, fishing, and going to pubs. This activity was "consistent with the total evidence in the file." Clover said he was unable to continue working as a carpenter, and Markley found this decision "consistent with the total evidence in the file" and gave it "controlling weight." (Tr. 118–23.) After her assessment, Markley noted that there were several jobs available to Clover within the light work range. (Tr. 115.)

On August 14, 2005, Clover completed a disability report appeal with the help of his wife. He noted that his impairments had become worse since the time he last completed a disability report. As of August 5, 2005, he now had severe pain in his right hip, right leg, and back. He also noted difficulty walking, with pain in the right leg and hip area. On August 10, 2005, Clover saw Dr. John Ellis at the Chiropractic Clinic, complaining of severe back pain, pain in his right hip and leg, and difficulty walking. Clover received electrical shocks to his back, a massage, and manipulation of his back. At the time, Clover was taking Valium and Percocet for his pain.[24] (Tr. 102–08.)

_____

[24]Valium is used to treat anxiety, seizures, and can also be used to relieve muscle spasms. http://www.webmd.com/drugs. (Last visited July 3, 2008).

On September 1, 2005, Clover saw Dr. Marti, complaining of pain in his right lower extremity. Dr. Marti noted Clover had a history of problems in his right shoulder, but that surgery had been deemed unnecessary and a conservative line of treatment had been followed instead. X-rays revealed narrowing at L5-S1 and what appeared to be spondylolisthesis at L5-S1.[25] Dr. Marti believed that Clover had degenerative joint disease and a partial defect at L5-S1, which was consistent with Grade I spondylolisthesis. Dr. Marti recommended Xylocaine injections at the sacroiliac joint.[26] These injections provided relief and Clover was "able to walk out without [the] pain that he had before." (Tr. 164.)

On April 11, 2006, Clover saw Dr. Marti, complaining of back pain. Dr. Marti found bilateral spondylolysis at L5 with Grade I spondylolisthesia at L5-S1, degenerative disk disease at L5-S1, and mild degenerative changes at T12-L1. Dr. Marti also identified a small disk bulge at T12-L1, impinging on the thecal sac, and degenerative changes at L5-S1.[27] Dr. Marti found no evidence of disk protrusion, spinal stenosis, or neural foraminal encroachment.[28] (Tr. 160.)

On April 21, 2006, Clover saw Dr. Marti, complaining of back pain. Dr. Marti noted a history of severe lower back pain, with degenerative disk disease at L5-S1, and spondylolisthesis at L5 and S1, with a partial defect in L5 and S1. Dr. Marti noted that Clover responded well to injections of his S1 joint on the right side. A physical examination showed no evidence of significant pain in the neck or head. The right

---

[25]Spondylolisthesis is the forward movement of the body of one of the lower lumbar vertebrae on the vertebra below it, or upon the sacrum. Stedman's Medical Dictionary, 1456.

[26]Sacroiliac relates to the sacrum and ilium bones. The sacrum bone is the segment of the vertebra, which forms part of the pelvis. The ilium bone is a broad, flaring portion of the hip bone. Stedman's Medical Dictionary, 1104, 1377.

[27]The thecal sac is the tube which holds the spinal cord and spinal fluid. http://www.neurosurgerytoday.org/what/patient_e/tethered.asp.

[28]Stenosis is the narrowing or constriction of any canal. Stedman's Medical Dictionary, 1473.

shoulder showed some early atrophy of the muscles in the triceps area, with what appeared to be radiculopathy at C7. The left upper extremity was normal. Dr. Marti found Clover's chest was clear and his abdomen soft. Clover's back showed tenderness at the lumbosacral junction on both sacroiliac joints. Straight leg raises caused back pain, but no leg pain. Dr. Marti concluded that Clover suffered from lower back pain with sacroiliitis and spondylolisthesis.[29] Clover tried to be "active on a daily basis, works construction 2-3 days a week, but that is all he can handle." Dr. Marti recommended injections in the areas of the sacroiliac joints, advised Clover on exercise, and prescribed Percocet for the pain. (Tr. 158-59.)

On August 3, 2006, Dr. Marti completed a physical functional residual capacity questionnaire, which he sent to Traci Severs, Clover's lawyer. In the questionnaire, Dr. Marti stated that Clover's "condition will only deteriorate and will not improve." Clover experienced pain in his right upper extremity, lower back, right lower leg, and neck. Because of the pain, Clover had not been able to carry out work activities. For the last six years, "he has been only attempting to do light work and helping others, but has not been able to carry out a regular work activity." Dr. Marti believed Clover could lift no more than ten pounds frequently, twenty pounds occasionally, and could never lift fifty pounds. He could stand for no more than forty-five minutes and had significant limitations in reaching, handling, or fingering. (Tr. 303-06.)

**Testimony at the Hearing**

At the hearing on July 11, 2006, Clover noted his work history. He last worked at the St. James golf course, for two weeks, where he collected money for green fees. Clover said he could not wash windows and golf carts, as he was asked to do, and could not return to working that job. Clover had also worked as a carpenter for sixteen years, but could no longer perform the heavy lifting required by the job because of

---

[29]Sacroiliitis is inflammation of the sacroiliac joint. Stedman's Medical Dictionary, 1377.

his right arm.  Clover last worked for pay in March 2005, when he was helping his son put up sheet metal on a barn roof.  The sheets weighed around thirty pounds.  (Tr. 307-16, 327.)

Clover had surgery on his right wrist, but has had no other surgeries.  He testified he had severe arthritis in his lower back, with back pain at about 5 out of 10 at the hearing.  Clover was taking Percocet, Aleve, and Tylenol, but no other prescription medication.  Other than Dr. Marti, Clover was not seeing any doctors on a regular basis.  Clover received injections into his back, but said they were largely ineffective.  (Tr. 316-18.)

Clover had trouble sleeping, with a pain that shot through his right side.  He was able to dress himself, take a shower, take out the garbage, mow the lawn with a riding mower, do laundry, and do some cooking.  Shaving was a little difficult because of his wrist problems, and he could no longer garden or fish.  Buttoning items was also difficult because his hand was numb.  He also had limited range of motion in his wrist.  (Tr. 318-24.)

Clover said he did not have a lot of strength in his left arm, but could probably lift a gallon of milk.  He could sit for an hour before his lower back began to hurt, and could stand for twenty minutes before his right leg went numb.  (Tr. 324-28.)

### III.  DECISION OF THE ALJ

The ALJ found Clover suffered from the residuals of a broken right wrist, reduced motion at the right shoulder, and degenerative disk disease.  The ALJ found that these impairments were severe.  (Tr. 12.)

Despite these impairments, the ALJ concluded that Clover had the residual functional capacity to lift and carry up to ten pounds, sit for approximately six hours in an eight-hour workday, and walk and stand for up to two hours in an eight-hour workday.  In reaching this conclusion, the ALJ considered Clover's subjective symptoms and the objective medical evidence.  (Id.)

The ALJ did not find Clover completely credible.  The ALJ believed Clover's impairments could produce some of his symptoms, but believed that Clover's statements relating to the intensity, persistence, and

limiting effects of his symptoms were not entirely credible. (Tr. 13.)
The ALJ noted that Clover's treating physicians had never imposed any
long term and significant limitations on his functional capacity. There
was no medical evidence that Clover had required prolonged
hospitalization from the time of the onset date. The ALJ noted that
Clover had tried to be active on a daily basis, working construction two
to three days a week, had installed a ceiling fan, and lifted thirty-
pound materials over his head. Clover reported taking Tylenol and
drinking several alcoholic drinks each day.[30] Finally, the ALJ found that
Clover had not received consistent treatment, visiting Dr. Marti only
periodically. (Tr. 14-15.)

The ALJ gave more weight to the opinions of Dr. Heim than to the
opinions of Dr. Marti, but was willing to believe Clover was more limited
than the state medical agency consultant had found. (Tr. 15.) The ALJ
detailed Dr. Marti's treatment and Dr. Heim's treatment of Clover. The
ALJ noted that Dr. Heim believed Clover was not giving a full effort
during his range of motion tests, and that Dr. Heim found no evidence of
right cervical radiculopathy. Reviewing Dr. Heim's medical reports, the
ALJ found there "was no evidence that the claimant should not have normal
shoulder motion." (Tr. 13-14.)

The ALJ found Clover was unable to perform his past work, either as
a drywall foreman, or a laborer at a golf club. The drywall work
required frequent heavy lifting, and the golf club work required
prolonged standing. Nonetheless, the ALJ believed there was a
significant number of jobs in the national economy that Clover could
perform. (Tr. 15.) Based on his residual functional capacity, the ALJ
believed Clover could perform the full range of sedentary work, and was
not disabled within the meaning of the Social Security Act. (Tr. 16.)

---

[30]The extent of Clover's drinking is unclear. The ALJ's opinion says
Clover reported "drinking 68 [alcoholic] beverages a week." (Tr. 14.)
In one medical report, Dr. Marti noted that Clover "does not have a
history of substance abuse, but he lists drinking 68 alcohol[ic]
beverages a week, and most of that is beer." (Tr. 158.) A medical
history questionnaire from April 26, 2005, notes no history of substance
abuse. (Tr. 276.) Yet, Dr. Demorlis reported that Clover had about 8
to 10 beers a day, and at the hearing, Clover noted he had lost his
license because of a DWI. (Tr. 285, 312.)

## IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings are supported by substantial evidence in the record as a whole. Pelkey v. Barnhart, 433 F.3d 575, 577 (8th Cir. 2006). "Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that detracts from, as well as supports, the Commissioner's decision. See Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000). As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least 12 months. See 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A). A five-step regulatory framework governs the evaluation of disability in general. See 20 C.F.R. §§ 404.1520, 416.920; see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Fastner v. Barnhart, 324 F.3d 981, 983-84 (8th Cir. 2003). If the Commissioner finds that a claimant is disabled or not disabled at any step, a decision is made and the next step is not reached. 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4).

In this case, the Commissioner determined that Clover could not perform his past work, but that he maintained the residual functional capacity (RFC) to perform the full range of sedentary work.


## V. DISCUSSION

Clover argues the ALJ's decision is not supported by substantial evidence. Specifically, Clover argues the ALJ failed to properly weigh the medical testimony. Clover also argues the ALJ erred by failing to

call a vocational expert and by looking only to the medical-vocational guidelines.

**Weighing Medical Testimony**

The ALJ has the role of resolving conflicts among the opinions of various treating and examining physicians. Pearsall v. Massanari, 274 F.3d 1211, 1219 (8th Cir. 2001). The ALJ may reject the conclusions of any medical expert, whether hired by the government or claimant, if they are inconsistent with the record as a whole. Id. Normally, the opinion of the treating physician is entitled to substantial weight. Casey v. Astrue, 503 F.3d 687, 691 (8th Cir. 2007). The opinion of a consulting physician, who examines a claimant once, or not at all, generally receives very little weight. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000).

Still, the opinion of the treating physician is not conclusive in determining disability status, and must be supported by medically acceptable clinical or diagnostic data. Casey, 503 F.3d at 691. The ALJ may credit other medical evaluations over the opinion of a treating physician if the other assessments are supported by better or more thorough medical evidence, or when the treating physician's opinions are internally inconsistent. Guilliams v. Barnhart, 393 F.3d 798, 803 (8th Cir. 2005); Cantrell v. Apfel, 231 F.3d 1104, 1107 (8th Cir. 2000). In determining how much weight to give a treating physician's opinion, the ALJ must consider the length of the treatment relationship and the frequency of examinations. Casey, 503 F.3d at 692.

Clover argues the ALJ failed to properly weigh the opinion evidence. As an initial matter, the ALJ did not reject the opinions of Dr. Marti – he simply stated that he was giving "[m]ore weight . . . to the opinion of neurosurgeon, Dr. Heim, than to the claimant's treating physician." (Tr. 15); see Casey, 503 F.3d at 692 (noting the difference between rejecting a physician's opinion, and simply affording the opinion less weight). Indeed, the ALJ detailed Dr. Marti's letter to Dr. Heim, and described Dr. Marti's evaluations of Clover on May 6, 2005, April 11, 2006, and April 21, 2006. The ALJ also noted that Dr. Marti saw Clover in September 2005. (Tr. 12-15.) According to the record, these four

visits were the only times Clover saw Dr. Marti after his alleged onset date of March 28, 2005.

Yet, despite detailing Clover's visits with Dr. Marti and Dr. Heim, the ALJ did not provide any justification for favoring the opinions of Dr. Heim over the opinions of Dr. Marti, Clover's treating physician. The Social Security regulations require that the ALJ give reasons for giving less weight to or rejecting the statements of a treating physician. <u>Hamilton v. Astrue</u>, 518 F.3d 607, 610 (8th Cir. 2008) (citing 20 C.F.R. § 404.1527(d)(2)). "Whether the ALJ gives great or small weight to the opinions of treating physicians, the ALJ must give good reasons for giving the opinions that weight." <u>Id.</u> Confronted with a decision that fails to provide "good reasons" for the weight assigned to a treating physician's opinion, the district court must remand. <u>Halloran v. Barnhart</u>, 362 F.3d 28, 33 (2d Cir. 2004); <u>Rhodes v. Massanari</u>, 8 F. App'x 741, 742-43 (9th Cir. 2001).

In this case, the ALJ failed to provide any reason for crediting the opinions of Dr. Heim over the opinions of Dr. Marti. This was legal error and the decision should be remanded for further consideration. <u>Villanueva v. Barnhart</u>, No. 03 Civ. 9021 (JGK), 2005 WL 22846, at *13 (S.D.N.Y. Jan. 3, 2005). On remand, the ALJ should reconsider the medical testimony and / or provide a clearer explanation for the decision.

As noted above, the ALJ did not reject the opinions of Dr. Marti; he simply stated that he was giving greater weight to the opinions of Dr. Heim. But in his opinion, the ALJ failed to explain exactly which opinions he was relying on, and which opinions he was discounting. It is therefore unclear which medical opinions the ALJ relied on in determining Clover's RFC. On remand, the ALJ should also explain which medical opinions he relied on and state his reasons for relying on them.

**Vocational Expert Testimony**

Clover also argues that the ALJ erred by failing to call a vocational expert and by relying only on the medical-vocational guidelines.

When the ALJ determines that a claimant cannot perform past relevant work, the burden shifts to the Commissioner to prove there is work in the national economy that the claimant can perform. Ellis v. Barnhart, 392 F.3d 988, 993 (8th Cir. 2005); 20 C.F.R. § 404.1560(c). If the ALJ finds the claimant has only exertional impairments, the Commissioner may meet this burden by referring to the Medical-Vocational Guidelines. Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992). If the ALJ finds the claimant suffers from a nonexertional impairment, the Commissioner may meet this burden by consulting the Guidelines only in certain circumstances. See Lucy v. Chater, 113 F.3d 905, 908 (8th Cir. 1997); Sanders v. Sullivan, 983 F.2d 822, 823 (8th Cir. 1992). "An ALJ may use the Guidelines even though there is a nonexertional impairment if the ALJ finds, and the record supports the finding, that the nonexertional impairment does not diminish the claimant's residual functional capacity to perform the full range of activities listed in the Guidelines." Lucy, 113 F.3d at 908.

On the other hand, if the ALJ finds the claimant has nonexertional impairments, and these impairments diminish the claimant's capacity to perform the full range of jobs listed in the Medical-Vocational Guidelines, the Commissioner must solicit testimony from a vocational expert to show the claimant has the capacity to perform work in the national economy. Robinson, 956 F.2d at 841. A nonexertional impairment is any limitation, besides strength, which reduces an individual's ability to work. Sanders, 983 F.2d at 823. Pain and mental impairments are two such limitations. See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

In Beckley, the Eighth Circuit noted that objective proof could account for the claimant's pain. Id. at 1060. The claimant had been diagnosed with bulging disks and vascular headaches, had several visits to doctors, took numerous prescription medication for pain and inflammation, and had undergone several different types of treatment. Id. In this case, Clover has been diagnosed with disk protrusion, degenerative disk disease, and spondylolisthesis. He has been to the doctor on a number of occasions, and was prescribed Percocet, a narcotic pain reliever, used to treat moderate to severe pain. He had received

Xylocaine injections, participated in occupational therapy, and undergone MRIs and EMGs. Finally, the ALJ found Clover was more limited than the state agency medical consultant had found him. The medical record demonstrates that Clover suffered from pain that cannot be completely discounted. See Id. at 1060. While the pain may not be severe enough to be disabling, the ALJ erred by relying exclusively on the Guidelines. On remand, the ALJ should have a vocational expert testify to the effect of Clover's pain on his RFC.

## VI.  RECOMMENDATION

For the reasons set forth above, it is the recommendation of the undersigned that the decision of the Commissioner of Social Security be reversed and remanded under Sentence 4 of 42 U.S.C. § 405(g). Upon remand, the ALJ should reconsider the medical testimony and / or provide a clearer explanation of the decision. The ALJ should also explain which medical opinions he relied on and state his reasons for relying on them. Finally, the ALJ should call a vocational expert to testify to the effect of Clover's pain on his RFC.

The parties are advised that they have ten days to file written objections to this Report and Recommendation. The failure to file timely written objections may waive the right to appeal issues of fact.


         /S/    David D. Noce
    **UNITED STATES MAGISTRATE JUDGE**


Signed on August 4, 2008.

-23-